We'll hear argument first this morning in Case 09-1533, DePierre v. United States. Mr. Pincus. Thank you, Mr. Chief Justice, and may it please the Court. The question in this case is whether the dramatically harsher mandatory minimum penalty for what the statute terms cocaine base applies to all offenses involving cocaine or only those involving substances with the characteristics of crack cocaine. In its brief in the Kimbrough case, the government described the provision at issue here as reflecting Congress's determination that, and I'm quoting, crimes involving crack should be subject to considerably more severe penalties. We agree. Congress's targeting of a limited subset of the substances qualifying chemically as cocaine is manifest in the statutory structure and the language for three basic reasons. And I'm going to be looking at page 2 of our blue brief, which has the relevant statutory provision. First, the only way to give different meaning to two distinct terms that Congress used in the statute, cocaine on the one hand and cocaine base on the other, is to make clear that cocaine base means something different than all substances with the chemical formula C-17, H-21, and O-4. Mr. Pincus, if I understand your interpretation correctly, it would exclude freebase. How is that a sensible interpretation of the statute, one that would exclude freebase, a commonly known substance? Congress was aware of it. The Richard Pryor incident had occurred. Everybody knew it was dangerous. Wasn't it at least true that Congress meant to incorporate that substance as well? Let me answer your question with a little bit of detail, Justice Kagan, because I think our reply brief wasn't as clear as it might have been. Because the word freebase has really three different meanings. It means a manufacturing process, it means a method of use of a cocaine-related substance, and it also means a substance. So just to be clear, freebase, the manufacturing process, occurs when cocaine hydrochloride, the powder form of cocaine, is mixed with ether and ammonia in a very volatile mixture and boiled. Most — many users of freebase inhale the fumes that are released during that manufacturing process. That process is very dangerous, as the Richard Pryor incident showed, because the substance is quite volatile and will explode. If that process — if the substance is not used then, but goes to the very end when all of the liquids are boiled off, then it does produce a rock-like substance similar to crack cocaine. Our submission is that the — if the substance is permitted to go to the end and, in effect, ether and ammonia are used as a substitute for sodium bicarbonate, then the substance does qualify under the statute because it is a rock-like substance that has — is chemically cocaine and was produced in a method similar to the reacting of sodium bicarbonate with baking soda. But in — when the process is in the middle of the production process, we don't think Congress meant to reach that for a couple of reasons. First of all, because that was — that substance is not something that's easily marketable. And one of the key things that Congress was concerned about was the marketability of crack cocaine in its rock-like form. That's what made the really big difference. Ginsburg. And, Mr. Pincus, the substance that is involved in this case was a rock-like substance, and it wasn't powder. So why doesn't it belong — it's a rock-like substance. Why should it be outside the category cocaine-based? Pincus. Well, I think there would be a factual question in this case. None of the courts below Justice Ginsburg determined whether, in fact, this — the substance at issue in this case was crack cocaine, because the district court ruled that that wasn't necessary, that all chemical — as long as the substance chemically qualified as cocaine, it satisfied the statutory requirement, and the First Circuit agreed. So in this case, there's no question. Ginsburg. You were objecting to a charge to the jury that charged cocaine-based and didn't charge crack. Pincus. We're — we're objecting to the fact that the district judge charged the jury and himself determined that in order for this very severe 100-to-1 penalty to apply, it was not necessary for the substance to qualify as crack cocaine. All it has to do would be a — to be a chemical form of cocaine. If we agree with you, how should a judge instruct a jury to determine whether a substance is crack? Should the judge use the definition in the sentencing guidelines? A judge could use the definition in the sentencing guidelines, Your Honor. Let me just say as a threshold question, in many cases, this won't be a jury question. But in those — in those cases, we think there are three — there are three elements. One is the substance has to qualify chemically as cocaine. The second is it was prepared by processing cocaine hydrochloride with sodium bicarbonate or with a different reactant that produces a similar chemical effect. And third, that it's a rock-like or otherwise solid that is smokable, that is able to produce the inhalable vapors. We think those are the key — It has to have all three of those characteristics. All three of those characteristics. But I thought you just said that freebase would qualify, and freebase would not have the second of those characteristics. Isn't that right? It was — it would not be prepared using a base. It wouldn't, because ammonia is one of the — is one of — it's ammonia and ether that have to — that are used to prepare freebase. Any base. Any base. We are — the lower courts in applying the sentencing guidelines definition have said that sodium bicarbonate is not required. We think it is not required. They have recognized other substances, and we think as long as the process is similar, that that's what the sentencing guidelines are, that's what the statute is. Scalia I don't understand that. I can understand the argument that Congress was directed at its statute at crack. And crack had a very definite meaning, which didn't include any substance that is rock-hard and has been produced in the manner you suggest. You're coming up — you're urging upon us a definition that neither is the definition of crack nor is the chemical definition of a cocaine base. It's neither fission or foul. Clement Well, respectfully, Justice Scalia, I think that Congress was focused on crack. Scalia Crack. Clement Because it was a substance that had particular characteristics. Scalia But you don't argue that. That's not the meaning you want us to give it. Clement Well, we do want the meaning to be a substance with those particular characteristics. I think the only question that we're debating is whether baking — the use of baking soda is essential, because all of those other three characteristics are characteristics of crack. Scalia It's essential to crack. You wouldn't call it crack if it weren't made that way, would you? Clement Well, I think in 1986 the definitions were not that clear. And I think the Sentencing Commission has said, and certainly the lower courts have said, both in applying the limited definition of the statute for which we contend and also in interpreting the sentencing guidelines, that the use of a different base gets at what Congress — is still a category of substance that Congress has — Congress cared about. Obviously, if the Court would like to construe the statute more narrowly and say baking soda is required, we wouldn't object to that. But we think that Congress — one of the reasons that Congress used the term cocaine base was that it was trying to capture a category of substances that had particular characteristics and wasn't focused so much on the exact chemical formula that went into it, because Congress knew in the drug area it had been rolled into that. Scalia How does cocaine base suggest what you want? It has to be rock and it has to be base cocaine produced in one of the fashions you suggest. I don't know how cocaine base remotely suggests that. Well, I think in three ways, Your Honor. First of all, because Congress didn't use the term cocaine, which is used elsewhere in the provision, it clearly meant a subset. It didn't mean all of the substances with the chemical formula that satisfies the chemical term cocaine. Second of all, the statute shows just by the 100 to 1 ratio that Congress was focused on something that was especially dangerous, much more dangerous than powder. Third, the legislative context was, as the Court said in Kimbrough, that this was a statute that was enacted in response to a particular problem. And I think the question we're debating is, would Congress have said when it defined the term — when it defined the term cocaine base? And I should say base was one of the street terms, colloquial terms that was used at the time to describe these categories of substances. Sotomayor All of them or just crack? It was — free base was a word, base was a word, crack was a word. The legislative debate didn't distinguish necessarily the chemical — form the chemical process for creating the substance. What it focused on was a substance that had characteristics that had led to the epidemic that Congress was concerned with. And those characteristics were easy marketability, because it was a solid, incredibly strong addictive potential, and inhalability. Roberts Counsel, the provision refers to a mixture or substance which contains cocaine base. You read cocaine base to be crack, so you have to be talking about a mixture or substance which contains crack. What contains crack? Crack is the problem they were getting at, yet the statute, as you read it, has to talk about a substance which contains crack, not just crack. Yes, Your Honor. And we think the reason that Congress used that phrase was often in this reactive process at the end of the day, the rock will not be pure cocaine in a rock form. There may be some cocaine hydrochloride that didn't react with the base. There may be — then there often is some of the base that reacted with the present. Roberts It's an odd way for Congress to phrase the provision if what they want to get at is crack, to say what we want to get at is substance which contained crack. That suggests to me when you talk about substances that contain something, what they contain is a base that then is used in the substance. I think that's a harder logic to apply when you're talking about crack. They want to stop the use of crack. Not so much — it wouldn't occur naturally that they're talking about substances which contain crack. It would occur naturally, that language formulation, if you think of cocaine base as broader than just crack. Respectfully, I disagree with you, Mr. Chief Justice. The provision just above, large Roman numeral IV, talks about compounds and mixtures. And Congress is sensitive in crafting the drug laws that often because these substances are not prepared in a chemistry lab, there are many, many impurities associated with them. For example, even cocaine hydrochloride, cocaine powder, is not pure cocaine hydrochloride. It's often diluted. It's often cut with other impurities. And so in all — throughout the drug laws, Congress has used that, and we think that's exactly why it used a similar phrase here, because the crack rock does not contain 100 percent chemical cocaine in a rock-like form. There will be cocaine powder often, cocaine hydrochloride left. There will be baking soda left or the other reactant. And so it will be a mass of substances, and Congress needed that language to avoid defendants saying this substance is not 100 percent cocaine in a crack form, and therefore, I don't qualify as a drug. Roberts. You kind of elided the point there just in your verbal formulation. It's easier to say this is something that's not just cocaine. It's harder to say this is something which is not just crack, because crack is a type of cocaine. You can say it contains, as the government says, cocaine base. I may be missing your point, Your Honor. But I think even cocaine in a crack form has other — the rock that what Congress was trying to get at.  Roberts. And you're saying Congress is afraid that the sodium bicarbonate, we might not be able to get at that if we just say crack. No, that the defendant would say this — if it doesn't — if it didn't say a mixture which contains, if it said cocaine base, then the argument might well be you have to distill the substance to find out how much cocaine base is actually in it, as opposed to how much of it actually is cocaine in a rock form, as opposed to other things that have been mixed in, instead of, as this Court decided in Chapman, it's the whole package that one weighs. And so I think Congress was getting at the idea that it didn't want people to either avoid the falling within Clause 3 entirely, or trying to escape the 50-gram crack threshold by saying there are other things in here that you have to take out before you — before you can impose this penalty on me. Other than crack and freebase, are there any other forms of cocaine base that are actually in use in any substantial amounts in this country by drug users? Well, I think we don't know, Your Honor. There are certainly cocaine leaves can be in the country, and under the government's definition of the statute, cocaine leaves would qualify under Clause 3. Cocoa paste, coca paste can be imported into the country. There are cases like that. Are there actually people in the United States who are smoking coca paste? I thought that that was exclusive to South America. They may not be smoking it, Your Honor, but they may be bringing it into the country in that form and then converting it into the country. Are you aware of cases where that's happened? There are. The case that we point to regarding the cocaine that was intermingled in luggage and in the fiberglass of a flowerpot are both cases where it was not cocaine hydrochloride, it was cocaine. So it was either coca paste or some later more distilled form of chemical cocaine as opposed to cocaine hydrochloride, but it was not in a rock form. And I think the fact that you're going to go back to your definition of crack, just so I'm clear on it. If a substance to the second prong of your definition, if a substance is tested and chemically it is pure C17H21NO4, no trace of sodium bicarbonate, no trace of ammonium, is it possible for a defendant to be convicted and given the crack penalty? Yes. Yes, it is, Your Honor. Their case is applying the Sentencing Guideline test, which is a similar test, in which the courts have said the absence of a reactant. I guess what you're getting at is if the reactant is not present in it. That's right. Then could you just reiterate what the second prong of your test is, because I thought I was under the impression that it required the presence of a reactant. It is that it was prepared by processing sodium hydrochloride with a base or with baking soda or a similar reactant. That means prepared from the powder. It was prepared from cocaine powder, yes. So you need extrinsic evidence about how this particular substance was prepared in order to satisfy it. If you don't have the trace elements of the reactant, you need evidence that that's how this was made? Your Honor, the courts have not required they've they the courts applying the Sentencing Guidelines have said that a chemist can testify based on his knowledge, and they've found the Sentencing Guidelines satisfied, that in his professional opinion, that's how this substance was prepared. Would it be enough for you if it had the right chemical definition and it was a rock-like substance, just those two things, would that be enough? If the government could show it has the right chemical definition, it's rock-like, it's solid, does it have to show anything else? I think that the element of the Sentencing Guidelines, which we're picking up in our second element, Your Honor, is useful in making clear that this is a substance that was, went from cocaine hydrochloride back to cocaine base, because I think that's one of the. I'm asking the same kind of question that Justice Alito is asking, whether the government has to show anything particular to demonstrate that it was prepared from powder cocaine. I think that the government doesn't have to produce, doesn't have to make a physical showing. It can't. It is enough for the government's chemist, and there's always a chemist that testifies in these cases, to say in his opinion that's true. I think, as a fallback, we would certainly be happy with the definition that just had the first and the third ingredients in what I've said. But I think the second is important, because one of the things that Congress was focused on was the potency of the crack and crack-like substance. Scalia, you've lost me. You responded to the Chief Justice when he raised the problem that this has to be not just cocaine base, it has to be a mixture containing cocaine base. You responded to him by saying, well, crack always has some mixture in it. It's never pure, and that's why crack would be covered. But in response to Justice Alito, who asked you, what if it's pure, if it's pure cocaine base without any admixtures, you say that would still be covered. I mean, both answers can't be right. I may have misspoken in my response to the Chief Justice, Justice Scalia. I thought the Chief Justice's question was that the formulation of a mixture or substance which contains somehow meant that Congress was getting at the chemical, all chemical forms of cocaine, because that formulation was more sympathetic than thinking that it required a rock-like substance. And in responding to the Chief Justice, all I was trying to say was not that it is always true that there are other things present, but just that it often is true that there are other things present, and that Congress's use of the word mixture or substance, therefore, was designed to deal with the ordinary case where other things may well be present and did not want to allow defendants to escape by saying this is not 100 percent cocaine in its chemical form, and therefore, I'm not covered by Clause 3. Sotomayor, I think the question here is the concern of the Court, I'm sorry, of the Congress, I'm sorry, Your Honor, is the converse of that question, which is, but if it is 100 percent cocaine in its chemical form in a rock-like state, is that covered, too? And I'm just trying to say, yes, that's certainly covered, too, but so is the dirtier form of a rock that has other things mixed in. What if it's pulverized? I don't know whether that's possible, but could you grind it up so that it's not rock-like anymore, so that it's like a powder? Can you smoke it after it's in there? Your Honor, I think that's one of the reasons that we would say a rock, rock-like or a solid that is otherwise smokable, to deal with people saying, oh, if it doesn't have to be a rock, I'll pulverize it. Even if it's tiny little rocks, if it still has the smokability characteristic, which is what Congress was focused on, we think that that would be sufficient. Sotomayor, can you get cocaine into a rock form without using a base? Is there some way that the rock-type form of cocaine could ever be achieved without a use of a base? No, I don't believe so, Your Honor. And cocoa paste, what can you do with cocoa paste? Can you make it into powder, or is it only usable as a ultimately for a rock-like formation? Cocoa paste is the intermediate step for all down-lying products. Cocoa leaves are mashed up in kerosene and other things, and through a process, they are, the first step is to convert them into cocoa paste, which is this sort of mushy brown substance with many, many impurities in it. It then typically is subject to subsequent processing, which turns it into cocaine hydrochloride, colloquially cocaine powder. And then the way that crack is produced is that cocaine powder is turned back, using the process we've been talking about, into a chemically cocaine in this rock-like form. Kennedy, you mentioned leaves several times, and you talk about that in your brief. If this were a trial court and we had two world-class chemists, strictly from a chemical standpoint, wouldn't they tell you that the cocaine in a leaf is in a salt form, not a base form? I don't think they would, Your Honor. We talk in our brief, we cite a number of studies that have found that cocaine is present in the leaf in both the salt and the chemically basic form. And I think the study we explain in detail why the government study, which is a little of the principal study they rely on, it's about 125 years old, doesn't capture the new learning. Initially the age of the leaf or if it's been in the sun or is it? No, I think it's just, you know, different leaves have different characteristics. The mix will be different, but as a matter of the chemical composition, there will be some cocaine in its chemical form and there will be some cocaine salt in the leaves. And I think even more important, Congress believed that. So is there a way to really? No, I thought that the chemist said that it's always a salt. No, Your Honor. And at least I thought that was the government's position, that it's a salt. That is the government's position, Your Honor, but on paper. But you ended by saying, oh, sometimes it's a salt. Our position is that within the leaf there is both forms coexist in the natural state, that there is both the salt form and the form that is chemically cocaine. And the studies that we cite on pages 9 and 10 and in the footnotes on that page, I think were very clear. Early on, the processes for extracting from the leaf made it difficult to tell whether the extraction process had made it into a salt or whether there was actual chemical cocaine in the leaf.  And as a practical matter, what difference does it make? Is the government going to be prosecuting anybody for possessing cocoa leaves? They say they're not, Your Honor. I think the reason it makes a difference is for the interpretation of what Congress meant, because our ---- I don't think Congress knew what this chemical debate was all about. I think it's very unlikely. Well, Your Honor, it's ---- Let's assume that the government's right, or that you're right, and that it's just No, let's assume the government's right, and it is no, you say it's base. We say it's both. You say it's both, but it includes base. Let's assume you're right, so what? I think then that would mean that the under the government's interpretation of the statute, offenses involving leaves, as long as there were more than 50 grams of them, would fall within clause 3, and that doesn't make any sense. But you just said it's an academic issue, because there's not a market for leaves or for base. What Congress was getting at was crack. The judge used the term cocaine base. Assume you are right, what should happen? Could you go back to the judge, and he would then say, well, this was ---- the chemist testified this is crack. Well, Your Honor, we'd like to go back to the judge, because in this case, in fact, the chemist didn't testify. The chemist did testify that it was chemically ---- it was cocaine in its chemical form, but the chemist did not testify, in my experience, this is crack, based on looking at lots of samples. It was ---- the testimony was it was a rock-like substance. What was instead was, what is it, bicarbonate, sodium bicarbonate was not mentioned. The testimony was there was no ---- there was no baking soda found, and that there was ---- that it was chemically basic. The testimony about whether it was crack or not principally came from the informant in the case, and a little bit from an agent who also said that he believed that cocaine powder was chunky. And so we believe we have a fair argument on remand when the district judge looks at the facts, that he will say the government did not meet its burden, even though it's only for Congress. Ginsburg. The district judge would be the finder, right? The district judge would be the finder, yes, Your Honor. Because you have no apprentice problem. Yes. I would like to reserve the balance of my time. Thank you, Mr. Pincus. Ms. Zaharsky. Mr. Chief Justice, and may it please the Court, whether you call it freebase, coca paste, or crack, it's the same thing chemically. It is cocaine-based, it is smokable, it has the same effects on the user. And Congress did not limit the statute to one form of cocaine-based. This Court shouldn't do it either. Just to pick up on some of the---- Sotomayor, I'm sorry. Cocaine paste, coca paste, is smokable in its paste form? Yes. It is smokable in its paste form, and that evidence was before Congress. It's cited in our brief. Sotomayor, assuming we accept the brief of the physicians and scientists, they say clearly that cocoa leaves can be chewed, but they are bulky and contain a lot of organic matter in addition to cocaine. I understood their scientific explanation to say that cocoa leaves contain cocoa, cocaine. I think you've taken the contrary position, but let's assume we accept the science's answer. What does that do to your argument? Well, of course, we don't think that that's right as a scientific matter, but probably more importantly, that's not something that we can prove. We have the world's experts working for the DEA in cocaine-related substances. We don't have one of them who would get up in court and say that cocoa leaves contain cocaine in its base form. So you're representing that you will never prosecute someone who possesses cocoa leaves under Subdivision III? The Romanet Provision, Romanet III, which would be the sentencing enhancement, we have never applied in any case to cocoa leaves. We have never even had a case where it's been an issue. We've never considered it. And you're representing to the Court that you won't? We don't have a chemist who would testify that. We would not be able to make that showing in court. But perhaps a more important question is whether there was evidence before Congress that the provision in Romanet III would apply to cocoa leaves, and there wasn't. There was evidence before Congress about different base forms of cocaine that distinguished between the solved form and the base form, and it mentioned substances like coca paste, it mentioned substances like freebase, and it mentioned crack. And the important thing in looking at the terms that Congress eventually used, cocaine base, is that that came from science. Petitioner says, well, you know, base was a colloquial term. The reason that base was used is because cocaine is in its base form. That is a base. Kagan, it's a bizarre term, Ms. Zaharsky. It's a — I mean, cocaine base means the exact same thing as cocaine, because cocaine is a base. It's like referring to an apple by saying apple fruit, or referring to a poodle by saying poodle dog. I mean, it's a strange way to speak about it. Zaharsky It is an extra-clear, extra-precise way to speak about it, and we think that there is a good reason that Congress did that. In the preceding provision in Romanet II, Congress was defining the whole world of cocaine-related substances. So when it used cocaine there, and it does mean cocaine base there, but cocaine, its salts, its optical and geometric isomers, it's talking about everything. It didn't need to distinguish between the different forms. And that formulation had already existed like that in the Controlled Substances Act. But then in 1986, Congress was hearing testimony about a specific form, the base form of cocaine. Did you at that point, would one want Congress to have just said cocaine in Romanet III? No. Congress said cocaine base because it wanted to be extra-clear. There is another reason, another — Kagan to be extra-clear, to use a different phrase that's meant to mean the same thing as another phrase. To use two different phrases that are meant to mean the same thing is not a very good way of being clear. Zaharsky Well, it's really just adding the extra word base. It's not like there are two completely different words. It's just the addition of base to be extra-clear. Another way to think about it is this. In 1986, prior to 1986, this Court had decided cases in which it had said somewhat imprecisely that cocaine hydrochloride was cocaine. It called it cocaine throughout its opinion. It didn't make a scientific finding, but that's how the Court referred to cocaine hydrochloride, cocaine. This was in its 1970 decision in Turner. It was in its 1985 decision in Montoya de Hernandez. Congress is presumed to know about this Court's decisions. It knew perhaps the courts had used the term cocaine imprecisely, despite the fact that it has a specific scientific meaning. Congress is going to be extra-clear and use the term cocaine base. Sotomayor So why didn't it draft it to say cocaine salts, et cetera, as opposed to cocaine, its salts, et cetera? If it intended to differentiate between true cocaine and its byproducts like salts, et cetera, why didn't it just simplify the language in Roman numeral number 2? Zaharsky Yes. I think that it does that, Your Honor. I'm looking at page 19 of the government's brief. This is, you know, throughout the briefs you have Romanet 2 and Romanet 3. If you look at Romanet 2, again, I'm on page 19 of the grade brief, but it's in other briefs, too. Romanet 2, Roman 2, cocaine, its salts, optical and geometric isomers. In Roman 2, cocaine does refer to the base form. Its salts refers to cocaine hydrochloride. Sotomayor But why would it do that? If it's going to treat cocaine base, which is the same thing as cocaine, differently from cocaine salts, why doesn't it just say cocaine salts? Zaharsky Well, it couldn't. Sotomayor Cocaine and its isomers or something. Its isomers, why is it using cocaine in an identical scientific way in Roman numeral number 2 and in 4? Zaharsky The base form has to be somewhere in Romanet 2, because the way that Congress drafted these two provisions together is that a large amount of substances are listed in Romanet 2 and then a subset is pulled out in Romanet 3. And Romanet 3 says, you know, 50 grams or more of a mixture of substance described in Clause 2 which contains cocaine base. So you need to have something that's described in Clause 2 that would contain cocaine base, and that would be the word cocaine in Roman 2. So you couldn't just say cocaine salts, meaning the hydrochloride form, optical and geometric isomers. You need something to get the base form into Roman 2. Alito No, but you could have, in Romanet 3, they could have said 50 grams or more of a mixture or substance which contains cocaine base, period. There was no need to have the described in Clause 2 if there's nothing in Clause in Romanet 2 that is not also in Romanet 3 with respect to cocaine. On your submission, it's just bad draftsmanship. Zaharsky I think that there is a redundancy, but I think it is understandable in light of the fact that courts had used the word cocaine somewhat imprecisely. I think it's also understandable in light of the fact that Congress was putting an enhanced penalty in play, and that if Congress had not been extra clear, there would be criminal defendants, perhaps like Petitioner, coming to court and saying if Congress had just said cocaine, that that wasn't clear enough. It's true that you're right, Justice Alito, that Congress could have said here are some things in 2, here are some things in 3, they don't overlap. Congress didn't do that. Ginsburg What is in 2? Now, on your reading, your expansive definition of cocaine base, what is in Romanet 2 other than powder? Saharsky Well, there is in Roman 1, coca leaves, except those from which all of the active substances have been taken out. In Roman 2, the salts of cocaine, they're optical and geometric isomers, and salts of isomers. You have 3, which is econine, which is a smaller molecule that is part of the cocaine molecule. It was used in pharmaceuticals a while back. It's not something that's really seen in the production process now. And you would have compounds, mixtures, or preparations that don't contain cocaine base. Alito What about optical and geometric isomers of cocaine? Those fall under Romanet 2, Roman 2, but not under 3? Are there such things? Saharsky Yes. There are optical. Optical isomers are generally substances that have the same chemical definition, the same, but different spatial arrangements of atoms. Optical isomers are non-superimposable mirror images, like right and left-handed versions of the same molecule. Those are both cocaine-based. There is a right-handed cocaine base and a left-handed cocaine base. They're both cocaine-based. We think that those would be counted within Romanet 3. Geometric isomers, which are never seen, are slightly different. They are based on spatial arrangements where a certain part of the molecule is pushed out or pushed up axially or equatorially. They're, you know, geometrically not seen. Ginsburg This is all very exotic, but practically, what does the government prosecute under Romanet 2? What substances other than? Saharsky I would say cocaine hydrochloride would be the primary one, which would be powder cocaine. Ginsburg Yes, so it seems there's a lot of words here, but in practice, 2 is powder and everything else is under 3. Saharsky Well, the things that would be under 3 would be any form of cocaine base. That would be coca paste, freebase, crack, whatever you want to call it. Just to explain, Justice Ginsburg, why there are so many words here, you know, this definition is taken from the same, the stuff in Romanet 2, this long definition from other places in the Controlled Substances Act. It's taken from Schedule 2, where Congress is defining the whole world of cocaine-related substances that are subject to Federal law. So that's where all of this comes from. Breyer Is it my understanding here that the problem in this case, and tell me if I'm wrong, is because cocaine can be a salt, people sniff it often, I guess, if it's a salt, and that's bad. And then there's a kind that's worse, that's freebase or crack. And that isn't a salt, and it isn't a poodle, and it isn't an acid. It takes a base form, right? Saharsky Yes. Breyer And so that's why they have a higher punishment. Then the odd problem is that maybe a cocaine leaf, but certainly cocaine paste, which are more primitive forms, also have a chemical-based solution. They, too. So they've written this statute that sounds like, you know, it sounds like who's your father's son who's not your brother? It takes a long time to figure it out. All right. So would you have an objection, and I wonder if the other side would have an objection, if what we said this word cocaine base in 3 means is that it is cocaine in the chemical form of a base after it has been processed beyond the stage of cocoa paste? And that's how we read it. That would seem to exempt the things they're most worried about, the paste and the leaves. And I'm not going to repeat the same stupid joke, poodles and fruits. But you see the point. Is there any objection from the point of the government to define it in that way or the other side? And why? Saharsky Yes. There's an objection on behalf of the government, and there are several reasons why that's true. The first is there often won't be evidence of how the substance was made. Second, how the substance was made. Breyer No, I don't care how it was made. All we do is test it. Now, all we have to do is test it, and then we look to see if it's a leaf. That isn't tough, I don't think. And then we have to look and see if it's this yellow stuff that looks like paste. And I guess that isn't too tough either. So those are the only things you have to do. You have to test it, look and see if it's a leaf, look and see if it's a paste. Now, even the — I mean, I didn't say even. I mean, certainly the DEA could do that. Saharsky With all respect, Your Honor, I just don't think it's that easy. Breyer No, that's what I want to know. Saharsky Okay. First of all, if you talk about the chemical testing that can occur, DEA chemists can tell you if it contains cocaine base or if it contains cocaine hydrochloride. Breyer You got that part right. Saharsky They're not going to start making guesses about how it was processed. They're just going to tell you what the chemical is. Breyer Yes, that's fine. Kagan But you don't need to do that, Ms. Saharsky. Suppose we just said it needs the right chemical definition and it's rock-like. Rock-like, crystalline, whatever you want to call it. So it's rock-like, it's not a paste, it's not a leaf, it's a rock. Saharsky Fine. As soon as the Court starts saying not a paste or rock-like or something like that, you have some problems. The first is you're basically giving a national uniform road map of evasion on behalf of drug traffickers. It doesn't — crack, for example, or the rock form doesn't have to be rock-like. You can grind it up in a coffee grinder and make it into a powder. It's still smokeable. It is chemically the exact same. Scalia Can you make it into a powder? Scalia I would assume that your major objection would not be that. Your major objection would be we're not supposed to be writing a statute. We're supposed to be interpreting one. And there is no way to get that out of these words. No way. Absolutely no way. Is there? Saharsky That is exactly how I should have started, Your Honor. Kagan But this is — but this is, Ms. Saharsky, just a strange statute where you are — your definition creates all kinds of issues about why it is that Congress used two different phrases to mean the same thing, and then how it is that if they did use two different phrases to mean the same thing, you're effectively reading cocaine out of the statute in Romanette II, right? Saharsky No. I think that that's based on a misunderstanding of how the statute works. You need to have cocaine in Romanette II so that when Romanette III says something contained in II that contains cocaine base, it is pulling out a substance that is in II. But it's not a redundancy. Kagan But, no, cocaine is the same as cocaine base. So it's like saying — it's like saying apples, oranges, and bananas cost $1. AFER said apples cost $3. That's a strange way to write a statute. Saharsky That is how Congress wrote the statute, though. It defined a large amount of substances, and then it pulled out one substance in that. Kagan But why would it say apples cost $1 in Romanette II if it was going to say apples cost $3 in Romanette III? Saharsky Because these definitions in Romanette II preexisted in other parts of the Controlled Substances Act in the definition section in 802, in the definitions of controlled substances in section 812. This series of definitions, which are the whole world of cocaine-related substances, are used several places. So Congress pulled them over and it used them here, too, to define the whole world of everything. It pulled out one thing for special treatment. Scalia Is it not relatively common, statutory drafting, to include something in an earlier section which is also included in a later section that imposes a higher penalty? For example, as I recall from my criminal law courses, States have statutes that provide the taking of a human life, homicide, is punishable by so much. And then it says the taking of a human life with malice aforethought is punishable by more. Now, does the second include the first? Of course it does. It includes the first and then something. And it seems to me that's the same thing here. It includes the first, the cocaine, but it has to be within a compound mixture preparation. Yes, you are 100 percent correct. And I think that the statutory language makes that clear because it says it has to be a mixture of substance described in clause 2. Ginsburg Then, Mr. Harsky, you do get the problem that Justice Breyer was trying to avoid. That is, on your definition, this paste, which is supposed to be less addictive, less addictive than powder, gets bracketed with crack, which is more addictive. I don't think that there is evidence that paste is less addictive than powder. They contain the exact same chemical, which is cocaine in its base form. And the question, they both can be smoked. Now, the question is, does one have a higher percentage purity of the chemical than the other? Maybe, but that just depends on how it was prepared. And there are cases in the courts of appeals, several in the cases that gave rise to the circuit split in this case, where the courts appeared to be grappling with whether something that was a little bit wet but still rock-like should be called a paste. So it could all be the same. Breyer No, but you define it in your brief, and this is very interesting to me. You talk about it being a yellow substance that came directly from grinding up leaves, something like that. You have the definition there. It's written. Take that definition that you wrote and what you said that's very interesting to me that I would like to know, is that that substance in some significant amount of times is actually more addictive, more dangerous than the salt which is ordinarily sniffed? Now, is that what you're saying? Because I received from this material the contrary impression. I had the impression that the yellow paste that comes from the leaf directly is, if anything, less addictive and less harmful, if anything, than the salt which you sniff. Now, which is it? Or it is the case that the paste, just like the freebase and the crack, can be smoked and for that reason is seen as more addictive than the powder. Breyer So now if I want to find a citation for the authority that paste, yellow, made out of leaves, is, in fact, more dangerous, and Congress could have thought that, than more dangerous than ordinary salt sniffed, I will read what? Because that's that – I did have that wrong impression. Saharsky You would read our brief, pages 30 to 30. Breyer Well, what do you refer to, in other words? I mean, I trust your brief implicitly, but I don't know on the scientific matter or the Congressional, I'd like to know what to read on that. Saharsky Right. And on those pages of our brief, we're citing evidence that was before Congress in the hearings in this case. There were statements by two different authorities who are scientists. Breyer What page is that of the brief? You don't have to read it to me. I'll read it. Saharsky No, that's okay. It's right here. It's like 29, 30, 31. There's a Dr. Bick, who tests from Yale, who testified specifically about the dangers of salt. Breyer I'll read that. Thank you. Saharsky And what I – the point I really wanted to make is that, you know, once the Court says it has to be pasty or it has to be yellow, you know, any of those things can be changed. The one thing that can't be changed is the chemical composition. It's still in the base form. It's still deadly. It still can be smoked. The paste doesn't have to be yellow, just like crack doesn't have to be white or off white. There was evidence that a few years ago there were folks in Ohio that were coloring crack green for St. Patrick's Day. Any of these things can be changed. It doesn't have to be rock-like. It can be ground up to a powder and it can be smoked that way. But the important thing is that it's the same thing chemically. And I think if you look at the Controlled Substances Act, not just in this provision but holistically, what Congress was concerned about was dangerous chemicals. This gets back to the point that the Chief Justice made, which is the reference in the provision at issue here to a mixture or substance containing cocaine base. The thing that Congress looked at was, do you have a substance which may not be 100 percent pure, it's sold on the street, but does it contain the dangerous chemical? Congress defined throughout the Controlled Substances Act the things that it was concerned about in chemical terms. And that's just not because it was an easy way to define things. It does give greater accuracy and certainty, but it's because the harms that are visited on people, the reason that they are controlled substances, that they don't have proved medical uses and that they are extremely addictive is because the chemical is inside of them and the chemical is dangerous. So whether you get the chemical out of paste, whether you get it out of rocks, whether you grind the rocks and make it into a powder, whether you freebase it, it is the same thing. And just to make sure the Court has, you know, some example or some thoughts as to the issues that would be caused if the Court started making up definitions of crack, you know, a word that doesn't appear in the statute and does not have any clear meaning, you know, Petitioner says it wasn't clear in 1986, the definition of crack. I just want to give the Court an example of some of the problems, the issues that the courts of appeals have confronted. In several courts of appeals, there have been substances which I think perhaps under Justice Breyer's definition would qualify as paste. The courts didn't call them paste, but in the Bryant case in the Fifth Circuit they said there was a brown, soft, mushy, wet substance that contained cocaine base, was being brought into the United States. The Easter case in the Tenth Circuit, a wet, gooey, cream-colored substance. Those courts are ones that use the chemical definition of cocaine base and they said, look, they contain cocaine base, they have the deadly chemicals, they count. Alitoson Well, my understanding of how this paste is produced is the following. You start with the leaves, then people vigorously macerate the leaves by stomping on them for an hour or more, and then this mixture is this, what's left is mixed with an alkaline material such as sodium bicarbonate, an organic solvent such as kerosene and water, and what you end up with is a gummy, yellowish solid called coca paste. Is that correct? Saharsky Yes, that's true, but it also can be dried. It can be dried and smoked. It has been dried in South America, so it's not always wet. It's just a question of, you know, whether it's had time to dry or not. Alitoson Now, if a chemist analyzed that and then analyzed crack or 3-base, wouldn't there be present in the coca paste lots of other substances that would not be present in quantities? Other substances would be present in quantities in the coca paste that would not be present in the crack or the 3-base? Saharsky Well, they all any of those would have impurities that are not cocaine base. All three of them would be identically chemical, chemically identical in that they would all contain cocaine base. But you're right. The impurities would be different because the method of preparation is different. Alitoson So a DEA chemist could test a substance and say, this is coca paste of the type that's smoked in South America by some people. This is crack or 3-base that has been mixed with water into a pasty substance. A chemist could make that differentiation, couldn't he? Saharsky I think it really depends, Your Honor. I think if it's just a regular DEA chemist, they would be able to tell you what chemicals they can find through standard techniques like infrared spectroscopy, like gas chromatography. And they can say, we've identified these chemicals in the substance. Unless it is a chemist, and we do have some that have additional knowledge of methods of preparation, DEA agents who have that kind of experience have seen it prepared. Those chemists, regular chemists would not be testifying about it, how it was prepared. For example, in this case, the chemist testified that the sample had cocaine base. It did not have detectable amounts of sodium bicarbonate. And then defense counsel said, well, is this — do you think that it's crack? I'm sorry, the chemist — the defense counsel said, tried to distinguish it from 3-base and said, is 3-base crack? And the chemist said, you know, I can't answer those questions. I can tell you scientifically what it includes. And that's really the issue of proof, is that you can tell chemically that it has the substance that Congress was trying to get at, the cocaine base. I suppose you can tell what other impurities are there, but, you know, Congress doesn't care about the impurities. It cares about the cocaine base. And that's why, you know, it says mixture of substance containing cocaine base. You know, one other thing that I just want to make sure is clear to the Court is that there was ample testimony before Congress at the time that it enacted this provision about the chemistry of this all, that when Congress spoke about cocaine base, it was understanding that base meant chemically the base form. And that, again, is near the pages. I cited to Justice Breyer in our brief. But two different scientists, one was the head of the National Institute for Drug Abuse, the other is a — was a professor at Yale. Both with experience, and they said things like, the form of the drug is the free base, the usual kind of cocaine is a salt, it is cocaine with hydrochloride, it is a salt like sodium chloride, but this has no chloride attached to it, it is free base, which is just plain cocaine. So Congress knew that the base form of cocaine is what normally would be called cocaine. It learned about the science and it used the term cocaine base. And I take your point, Justice Kagan, some of the other Justices, there is perhaps redundancy in saying cocaine base instead of just saying cocaine. But when Congress in 1986 was faced with a situation where courts, including this Court, had used the term cocaine to refer imprecisely to the cocaine hydrochloride form, and Congress was going to put a mandatory minimum penalty in place, Congress had every incentive to be extra clear. And that's exactly what we think that Congress was doing here. Scalia. Mr. Harski, I got — coming back to Roman at 3, 50 grams or more of a mixture or substance described in Clause 2. It doesn't have to be — it really doesn't have to be a mixture. It could be pure, couldn't it? It says mixture or substance, not mixture. Yes, it could be pure. I don't know that we've seen any cases like that, but it is almost always cut with something else. So just to wrap up and be as clear as possible, what Congress had intended to do in the Controlled Substances Act really was to pull out chemicals that have certain pharmacological effects on people that are dangerous. Congress did that by using the term cocaine base. That is a term that is expansive and includes all these kind of forms that we've been talking about today. The lower courts have struggled in trying to figure out whether a substance that's wet, off-white, rock-like, paste-like counts as cocaine base. Certainly, the Seventh Circuit has had several cases like that. It's struggled. If this Court picks just one definition to limit the term cocaine base, it's really setting up a road map to evasion for drug traffickers to change to a different form. We hope that this Court won't do that. We just don't think that the text supports it. It says cocaine base without any limitation. And this we just don't think that this Court should be adding a limitation based on what it thinks Congress must have intended but didn't say in the text. If the Court has no further questions, the judgment below should be affirmed. Roberts. Thank you, counsel. Mr. Pincus, you have four minutes remaining. Pincus. Thank you, Mr. Chief Justice. Just a couple of points. First of all, in response to Justice Breyer's question, the 2002 sentencing report, Sentencing Commission report on this issue on page 110 recommends to Congress that substances other than crack should be excluded from Clause 3, and I'm quoting, "...because they do not present the heightened concerns associated with crack cocaine." But she says there's no way, and she does cite this professor from Yale and so forth, who says if a stuff has the base in it, it can be abused in ways that if it has the salt in it, it can't be abused. That's all we can look at. That's her point. And you can respond to that if you want. I think that is her point. But I think the question here, all of these substances are criminalized and they're all going to be penalized. The question is what deserved the 100-to-1 sanction? That to us means something that Congress was especially concerned about, and certainly because the government agrees that cocaine hydrochloride is only in two, something that's worse than cocaine hydrochloride, which is a pretty bad thing. And as Judge Posner said, there's no reason to imagine that Congress meant to punish paste more than cocaine hydrochloride. Breyer. And she says there is a reason. It's because it contains base, and for many years it was smoked in Latin America. It can be smoked here. That's her reason. Now, your response is it's a bad reason? Our response is that it does not have the potency that crack had. It was smoked here and didn't give rise to the epidemic that occurred once crack was created, because that was more potent, more marketable, and led to all the evils that Congress was trying to get at. Second point, we would be very happy to accept your definition. Third point about the statutory language. I think the critical question here, as several members of the Court have noted, is that cocaine, not just in Romanet II, but throughout the statute, means all chemical forms of cocaine. If that's what Congress meant in 3, there was no reason to just not to just say it. The words cocaine base could have a chemical meaning, but the word base was also in this debate as a word that was being used to describe the specific evil that Congress was aimed at. And so we think, at the worst, there's ambiguity here. We think it's quite clear that by use of those different terms, Congress meant something different. But at worst, there's ambiguity here. And ambiguity under the rule of lenity means that the clause should be construed narrowly. And, Justice Scalia, going to your point in your analogy to State law, the problem here is that everything that is in Clause 2 is in Clause 3 under the government's interpretation. Because Clause 2, Roman II, has the word cocaine, and Clause 2, Roman IV, says any compound mixture or whatever containing cocaine, under the government's theory, that provision will never, ever be invoked, because every offense that uses cocaine is sanctionable under 3. And so it's not the situation with Scalia, same with homicide and murder. Every murder, every murder is a homicide. Yes, but the question here is whether every lesser form of homicide is also capital murder. And what the government's position means, every lesser form of homicide, everything that's in 2 that sets up a punishment, is also in 3. And we think that's the problem with their interpretation. And it's why, if it's unclear, as you said maybe it was, then the rule of lenity should apply, and Congress can fix it. If Congress meant to include all of these other substances, Congress can easily fix the statute. But we think given the way the statute looks right now, that's not possible. Sotomayor, let's assume, for the sake of a hypothetical, that the statute was the same, but that things were reversed, that the smaller universe of items was the salt rather than the crack. And so they put an enhancement in Roman numeral number 3 for salt rather than crack. Is your argument that it's redundant based on the fact that a larger grouping of the chemicals listed in Roman numeral number 2 is excluded by Roman numeral number 3, so that — is that the basis of your argument? That particular argument would still apply. Our principal argument, if I may answer the question, is that in this — in the government's interpretation, the word cocaine and the word cocaine base, the phrase cocaine base have the same meaning. That evil wouldn't be present, and therefore our argument would be harder, but it is present here. Thank you, counsel. The case is submitted.